UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br> - v. - <br><br>FARHAD SHAKERI,<br>CARLISLE RIVERA,<br> a/k/a "Pop," and<br>JONATHAN LOADHOLT,<br><br>Defendants. | **COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1956(h), 1958,<br>2339B, 3238 & 2; 50 U.S.C. § 1705<br><br>24 MAG 3904 |

SOUTHERN DISTRICT OF NEW YORK, ss.:

MATHEW CHRUSZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (CONSPIRACY TO PROVIDE MATERIAL SUPPORT
### TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION)

1.      From at least in or about December 2023, up to and including the date of this Complaint, in Iran, the Southern District of New York, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, FARHAD SHAKERI, the defendant, and others known and unknown, at least one of whom will be first brought to and arrested in the Southern District of New York, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b)(1), to a foreign terrorist organization ("FTO"), namely, the Islamic Revolutionary Guard Corps ("IRGC"), which was designated by the U.S. Secretary of State as an FTO on or about April 15, 2019, and is currently designated as such as of the date of the filing of this Complaint.

2.      It was a part and an object of the conspiracy that FARHAD SHAKERI, the defendant, and others known and unknown, would and did knowingly provide the IRGC with material support and resources, including services, property, and personnel (including himself), knowing that the IRGC was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that the IRGC engages and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act), and that the IRGC engages and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(E), and (d)(1)(F), and 3238.)

**COUNT TWO**
**(PROVISION OF MATERIAL SUPPORT TO A DESIGNATED**
**FOREIGN TERRORIST ORGANIZATION)**

3.      From at least in or about December 2023, up to and including the date of this Complaint, in Iran, the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, FARHAD SHAKERI, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly provided, attempted to provide, and aided and abetted the provision of "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), including, among other things, services, property, and personnel (including himself), to a FTO, namely, the IRGC, which was designated by the U.S. Secretary of State as an FTO on or about April 15, 2019, and is currently designated as such, as of the date of the filing of this Complaint, knowing that the IRGC was a designated FTO (as defined in Title 18, United States Code, Section 2339B(g)(6)), that the IRGC engages and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act ("INA")), and that the IRGC engages and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (E), and (F), 2, and 3238.)

**COUNT THREE**
**(MURDER-FOR-HIRE)**

4.      From at least in or about December 2023, up to and including the date of this Complaint, in Iran, the Southern District of New York, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, traveled in and caused another to travel in interstate and foreign commerce, and used and caused another to use the mail and a facility of interstate and foreign commerce, with intent that a murder be committed in violation of the laws of the State of New York or the United States as consideration for the receipt of, and as consideration for a promise or agreement to pay, a thing of pecuniary value, and attempted to commit and aided and abetted the same, to wit, SHAKERI, RIVERA, and LOADHOLT used cellphones and electronic messaging applications to communicate with each other in furtherance of a plot for RIVERA and LOADHOLT to kill an individual ("Victim-1") in New York City in exchange for payment.

(Title 18, United States Code, Sections 1958, 3238, and 2.)

**COUNT FOUR**
**(CONSPIRACY TO COMMIT MURDER-FOR-HIRE)**

5.      From at least in or about December 2023, up to and including the date of this Complaint, in Iran, the Southern District of New York, and elsewhere, and in an offense begun

2

and committed out of the jurisdiction of any particular State or district of the United States, FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit murder-for-hire, in violation of Title 18, United States Code, Section 1958.

6.    It was a part and an object of the conspiracy that FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, and others known and unknown, would and did knowingly travel in and cause others to travel in interstate and foreign commerce, and would and did use and cause another to use a facility of interstate and foreign commerce, with intent that a murder be committed in violation of the laws of the State of New York or the United States as consideration for the receipt of and as consideration for a promise or agreement to pay anything of pecuniary value, to wit, SHAKERI, RIVERA, and LOADHOLT participated in an agreement whereby RIVERA and LOADHOLT would kill Victim-1 in exchange for payment, and used cellphones and electronic messaging applications to communicate in furtherance of the scheme.

(Title 18, United States Code, Sections 1958 and 3238.)

## COUNT FIVE
### (MONEY LAUNDERING CONSPIRACY)

7.    From at least in or about December 2023, up to and including the date of this Complaint, in Iran, the Southern District of New York, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956.

8.    It was further a part and an object of the conspiracy that FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the murder-for-hire offenses charged in Counts Three and Four of this Complaint, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

9.    It was further a part and an object of the conspiracy that FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to a place in the United States

from and through a place outside the United States, and to a place outside the United States from and through a place in the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, the murder-for-hire offenses charged in Counts Three and Four of this Complaint, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h), (f), and 3238.)

## COUNT SIX
## (CONSPIRACY TO VIOLATE
## THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT)

### *The International Emergency Economic Powers Act*

10.     The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

### *The Global Terrorism Sanctions Regulations*

11.     On September 23, 2001, the President issued Executive Order 13224, providing that all property and interests in property in the United States of persons determined to have committed or to pose a significant risk of committing acts of terrorism that threaten U.S. nationals or the national security, foreign policy, or economy of the United States, or determined to act for or on behalf of such persons or to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or such persons—designated as Specially Designated Global Terrorists ("SDGTs")—are blocked. Executive Order 13224 authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Order.  Pursuant to this authority, the Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations ("GTSR"), implementing the sanctions imposed by the Executive Order.

12.     Title 31, Code of Federal Regulations, Section 594.201(a) of the GTSR provides, in relevant part:

> [P]roperty and interests in property of [SDGTs] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in . . .

without a license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC").

4

13.     Section 594.205 of the GTSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the GTSR.

a.     As alleged below, *see infra* ¶ 22, the IRGC has been designated as an SDGT pursuant to Executive Order 13224.

b.     As alleged below, *see infra* ¶ 23, the IRGC has been designated as an FTO by the U.S. Secretary of State.

### *Statutory Allegations*

14.     From at least in or about December 2023, up to and including at or about the time of filing of this Complaint, in Iran, the Southern District of New York, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, FARHAD SHAKERI, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the IEEPA.

15.     It was a part and an object of the conspiracy that FARHAD SHAKERI, the defendant, and others known and unknown, would and did cause U.S. persons to engage in transactions and dealings in property and interests in property of persons whose property and interests in property are blocked pursuant to the GTSR, including the IRGC, without first obtaining the required approval of OFAC; and to evade the requirements of U.S. law with respect to transactions and dealings in property and interests in property of the IRGC, in violation of Executive Order 13224 and Title 31, Code of Federal Regulations, Sections 594.201, 594.204, and 594.205.

(Title 50, United States Code, Section 1705; Executive Order 13224; Title 31, Code of Federal Regulations, Sections 594.201, 594.204, and 594.205; Title 18, United States Code, Section 3238.)

The basis for my knowledge and for the foregoing charges are, in part, as follows:

16.     I am a Special Agent with the FBI, assigned to investigate counterterrorism matters, including counterterrorism investigations involving crimes against the United States and U.S. citizens occurring outside the United States. Based on my training and experience, I have become knowledgeable about criminal activity, particularly violations of the federal terrorism statutes. I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with other law enforcement officers and other individuals, and upon my examination of various reports and records, including, among other things, materials obtained pursuant to legal process, pole camera footage, license plate reader data, and criminal history and prison information. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all the facts that I have learned during this investigation. Where the contents of conversations with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated. Some of the information recounted below is based on draft transcriptions, which are

subject to revision, and in some cases, I have indicated my interpretation of certain words or phrases in brackets, which interpretations are based on the context in which they appear as well as, among other things, my training and experience. Finally, to the extent there are grammatical, typographical, or spelling errors in any quotations in this affidavit, those errors appear in the original quoted material.

## Overview

17.     The Government of the Islamic Republic of Iran (the "Government of Iran") is actively targeting nationals of the United States and its allies living in countries around the world for attacks, including assault, kidnapping, and murder. The Government of Iran, and particularly the IRGC and its external operations force, the IRGC-Qods Force ("IRGC-QF"),[1] has a history of targeting individuals that the Government of Iran perceives as enemies, including dissidents living outside Iran and political adversaries. The Government of Iran engages in these activities to silence dissidents, and, in the case of political enemies, to seek revenge and sow discord. The regime also seeks to target nationals of the United States in retaliation for the death of Qasem Soleimani, the head of the IRGC-QF who was killed by a U.S. military strike in Baghdad on or about January 3, 2020.

18.     In recent years, the threat posed by the Government of Iran and its intelligence services has evolved. Rather than solely engaging in lethal operations themselves, Iranian intelligence services have outsourced certain assassination plots to organized crime groups and violent criminals.

19.     FARHAD SHAKERI, the defendant, is an IRGC asset residing in Tehran, Iran. SHAKERI is an Afghan national who immigrated to the United States as a child. In or about 2008, SHAKERI was deported from the United States after serving approximately 14 years in New York State prisons following his 1994 conviction for robbery. As described below, SHAKERI has used a network of criminal associates that he met during his time in prison to supply the IRGC with operatives to conduct surveillance and assassinations of IRGC targets (collectively, the "Shakeri Network"). The Shakeri Network of criminal associates includes CARLISLE RIVERA, a/k/a "Pop," the defendant; JONATHAN LOADHOLT, the defendant, who is an associate of RIVERA; an uncharged co-conspirator not named as a defendant herein ("CC-1"); and a second uncharged co-conspirator not named as a defendant herein ("CC-2").

20.     On behalf of the IRGC, FARHAD SHAKERI, the defendant, and his network have targeted or been instructed to target Victim-1, an Iranian American journalist, author, and political activist, and an outspoken critic of the Iranian regime's human rights abuses and corruption. Victim-1 has long been a high-priority target of the Iranian regime. In exchange for SHAKERI's promise of a payment of $100,000, CARLISLE RIVERA, a/k/a "Pop," and

---

[1] OFAC has stated that the IRGC-QF "is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia." *See* Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (Oct. 25, 2007) (*available at* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx).

JONATHAN LOADHOLT, the defendants, repeatedly sought to locate Victim-1 in approximately 2024 in order to murder Victim-1. As further detailed below, according to statements made by SHAKERI in recorded interviews with law enforcement agents, the IRGC has also tasked SHAKERI with carrying out other assassinations against U.S. and Israeli citizens located in the United States and elsewhere.

## The IRGC

21.     The IRGC is an Iranian military and counterintelligence agency under the authority of Iran's Supreme Leader and is composed of ground, naval, and air forces, as well as other components—such as an internal militia and the IRGC-QF.[2]

22.     On or about October 13, 2017, OFAC designated the IRGC as a Specially Designated Global Terrorist under Executive Order 13224, relating to global terrorism, for its key role in supporting the Government of Iran's involvement in international terrorism and particularly the terrorist activities of IRGC-QF. In its announcement, OFAC noted that the IRGC "has played a central role to Iran becoming the world's foremost state sponsor of terror" and highlighted the IRGC's support for "the lethal activities of Hizballah, Hamas, and other terrorist groups."[3]

23.     On or about April 15, 2019, the U.S. Secretary of State designated the IRGC as an FTO under Section 219 of the INA. In announcing the designation, the State Department noted that:

> The IRGC FTO designation highlights that Iran is an outlaw regime that uses terrorism as a key tool of statecraft and that the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago. The IRGC has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens.[4]

24.     Among its activities, the IRGC plots and conducts attack operations outside Iran targeting, among others, U.S. citizens residing abroad and in the United States, as do other Government of Iran intelligence services. For example, for the last several years, the Government of Iran has targeted Victim-1. In July 2021, an indictment returned by a grand jury in the Southern District of New York was unsealed charging an Iranian intelligence officer and three Iranian intelligence assets with kidnapping conspiracy and other offenses based on their participation in a plot on behalf of the Government of Iran to kidnap Victim-1 for rendition to Iran. *See United States v. Farahani, et al.*, 21 Cr. 430 (RA) (S.D.N.Y.). After the exposure of the *Farahani* plot,

---

[2] *See* National Counterterrorism Center, Counterterrorism Guide: Islamic Revolutionary Guard Corps (IRGC) (Mar. 2022) (*available at* dni.gov/nctc/ftos/irgc_fto.html).

[3] *See* Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-proliferation Authority (Oct. 13, 2017) (*available at* https://home.treasury.gov/news/press-releases/sm0177).

[4] *See* Designation of the Islamic Revolutionary Guard Corps (Apr. 8, 2019) (*available at* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html).

the IRGC directed another attempt to assassinate Victim-1 in New York City by paying members of the Russian mob to monitor and kill Victim-1 at Victim-1's home. *See United States v. Amirov, et al.*, S8 22 Cr. 438 (CM) (S.D.N.Y.).

25.    As set forth below, the Government of Iran's efforts to murder, and thereby silence, Victim-1 have not ceased.  The IRGC has tasked FARHAD SHAKERI, the defendant, to use the Shakeri Network, particularly CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, as well as others known and unknown, to locate, surveil, and kill Victim-1. *Infra* ¶¶ 27-33.

### SHAKERI's New York-Based Criminal Associates

26.    FARHAD SHAKERI, the defendant, is an Afghan national and former resident of New York currently residing in Tehran, Iran.  From my review of prison records and criminal history reports, SHAKERI's statements, and based on information further detailed below, I have learned that SHAKERI has a network of criminal associates residing in the New York City area, developed during SHAKERI's time in prison, that SHAKERI has used in furtherance of IRGC assassination plots.

a.    In 1994, SHAKERI was convicted following a plea of guilty to robbery in the first degree, for which he served approximately 14 years in New York state prisons. During his time in prison, SHAKERI overlapped with, among others, CC-1, and with CARLISLE RIVERA, a/k/a "Pop," the defendant.

b.    From approximately December 3, 1995 until approximately August 27, 2002, SHAKERI was housed at Woodbourne Correctional Facility ("Woodbourne").  During that time period, SHAKERI overlapped with CC-1, who was also in custody at Woodbourne from approximately June 25, 1996 until approximately April 28, 2002, following his 1991 conviction in New York state court for manslaughter.

c.    Years later, on or about January 22, 2019, following their release from U.S. custody, CC-1 and SHAKERI were arrested by the Sri Lanka Police Narcotics Bureau ("SLPRB") in Colombo, Sri Lanka, in connection with the seizure of approximately 92 kilograms of heroin.

d.    From approximately June 20, 2005 until approximately January 29, 2007, SHAKERI was housed at Fishkill Correctional Facility in Beacon, New York ("Fishkill"). During that time period, SHAKERI overlapped with RIVERA, who was also in custody at Fishkill from approximately June 23, 2004 until approximately July 20, 2007, following his 1994 conviction in New York state court for second-degree murder.

### The Shakeri Network Targets Victim-1

#### December 2023 – January 2024: SHAKERI Pays CC-1 To Locate Victim-1

27.    In approximately December 2023, FARHAD SHAKERI, the defendant, paid CC-1 approximately $3,000 to locate Victim-1.

a. On or about December 19, 2023, SHAKERI and CC-1 were in cellphone contact. According to cellular phone records provided by a cellular service provider, I have learned the following: a cellular telephone with a call number having a New York area code and ending in 4371 (the "4371 Number") had telephone contact with a cellular telephone having a call number with a country code for Iran and ending in 5893 (the "Iran 5893 Number"). According to subscriber records for the 4371 Number, that number is subscribed in CC-1's name. According to subscriber records for the Iran 5893 Number, that number is subscribed in the name "Feva," which SHAKERI has used as the listed subscriber for other of his electronic accounts and phone numbers.

b. A cloud account that was searched pursuant to a search warrant, and which is used by SHAKERI (the "Shakeri Cloud Account"),[5] contains an image of biographical information about Victim-1, such as possible addresses—including an address in Brooklyn, New York where Victim-1 resided at the time of the *Farahani* and *Amirov* plots described above, *see supra* ¶24 (the "Brooklyn Residence")—date of birth, and social security number. The image has a creation date of on or about December 24, 2023.

c. Records provided by Western Union show that, on or about December 29, 2023, CC-1 received a wire transfer of approximately $3,298.15 from an individual ("Payor-1") having an address in the United Arab Emirates ("U.A.E.").

d. On or about January 23, 2024, the 4371 Number again had telephone contact with the Iran 5893 Number.

e. The Shakeri Cloud Account contains an image depicting the front door and porch of the Brooklyn Residence with a creation date of on or about January 23, 2024.

28. As described above, FARHAD SHAKERI, the defendant, and CC-1 served time in prison together and engaged in drug trafficking together, *see supra* ¶ 26(b) & (c).

a. According to criminal history records, CC-1 was convicted on or about November 13, 1991, following a plea of guilty to manslaughter in the first degree and sentenced to a term of imprisonment of 8 to 24 years. SHAKERI was convicted on or about November 29, 1994, following a plea of guilty to robbery in the first degree and sentenced to a term of imprisonment of 7 to 21 years.

b. According to New York State Department of Corrections records, CC-1 was housed at Woodbourne from approximately June 25, 1996, to April 28, 2002. CC-1 was released on parole on or about December 14, 2006. SHAKERI was housed at Woodbourne from approximately December 3, 1995, to August 27, 2002, and, accordingly, overlapped with CC-1 from approximately June 25, 1996, until April 28, 2002.

---

[5] The contents of the Shakeri Cloud Account identify SHAKERI as its user, including photographs of SHAKERI, communications between SHAKERI and other individuals, and data reflecting personal information about him.

9

c.    According to a report prepared by a Special Agent with the Drug Enforcement Administration, and as set forth *supra* ¶ 26(c), SHAKERI and CC-1, along with others, were arrested on or about January 22, 2019, by the SLPRB in Colombo, Sri Lanka, in connection with a seizure of approximately 92 kilograms of heroin. At the time of his arrest, CC-1 was in possession of a cellphone using the 4371 Number.

<u>RIVERA and LOADHOLT's Possession of Firearms</u>

29.    Electronic accounts used by CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, contain numerous photographs of firearms, with creation dates between at least approximately December 2018 and June 2024, *i.e.*, both pre-dating SHAKERI engaging RIVERA and LOADHOLT to surveil Victim-1 and during the period in which they did, *see infra* ¶¶ 30-32.

a.    A cloud account that was searched pursuant to search warrants, and which is used by LOADHOLT (the "Loadholt Cloud Account"),[6] as well as certain other electronic accounts used by LOADHOLT that also were searched pursuant to search warrants, contain photographs of LOADHOLT holding firearms. The firearms depicted in the photographs and videos, with creation dates between at least approximately December 2018 and June 2024, include a Taurus G2s 9mm firearm, which is a subcompact handgun designed for easy concealed carrying; a Smith & Wesson M&P pistol; a Smith & Wesson .380 pistol, which is a compact handgun designed for easy concealed carrying; a rifle with a scope; an assault rifle; and a 9mm pistol with the serial number scratched off. For example:

 

b.    A cloud account that was searched pursuant to search warrants, and which is used by RIVERA (the "Rivera Cloud Account"),[7] as well as certain other electronic

---

[6] The contents of the Loadholt Cloud Account identify LOADHOLT as its user, including communications between LOADHOLT and other individuals, data reflecting personal information about LOADHOLT, and photographs of LOADHOLT, including photographs in which LOADHOLT is holding firearms.

[7] The contents of the Rivera Cloud Account identify RIVERA as its user, including communications between RIVERA and other individuals, data reflecting personal information

accounts used by RIVERA that also were searched pursuant to search warrants, contain stored images of firearms and knives, with creation dates between at least approximately July 2022 and August 2023, including a Taurus TCP firearm, which is an ultra-compact handgun designed for easy concealed carrying; a shotgun; and various assault rifles. For example:

 

**February 2024: SHAKERI Pays RIVERA and LOADHOLT**
**To Surveil Victim-1 at a Public Speaking Event**

30. In or about February 2024, Victim-1 was scheduled to appear at a public speaking event at Fairfield University, located in Fairfield, Connecticut ("Fairfield University"). FARHAD SHAKERI, the defendant, paid CARLISLE RIVERA, a/k/a "Pop," the defendant, approximately $1,000 for RIVERA and JONATHAN LOADHOLT, the defendant, to surveil Victim-1 at the event.

a. The Shakeri Cloud Account contains images showing a report on Victim-1's professional background and activities, with a creation date on or about February 1, 2024.

b. The Loadholt Cloud Account contains the image below, showing a screenshot of a text conversation with an account assigned to a phone number with a country code +960, which is assigned to the Maldives. This phone number is the verified phone number for the Shakeri Cloud Account, and is used by SHAKERI (the "Shakeri Maldives Number"). The screenshot of the conversation includes a partial image of Victim-1, the address of Fairfield University, the approximate time of the speaking event on or about February 15, 2024, at which Victim-1 was scheduled to appear, and a photograph of a money order in the amount of $500 to RIVERA.

---

about RIVERA, and photographs of RIVERA, including photographs of RIVERA posing with weapons, including firearms and knives.



c.      The Loadholt Cloud Account contains an exchange of text communications between RIVERA and LOADHOLT on or about February 14, 2024, in which RIVERA wrote to LOADHOLT, "Tomorrow that bread is supposed to come in. If it does we out! I have everything we need . . . ." In response, LOADHOLT "liked" RIVERA's message, "I have everything we need."

d.      The Loadholt Cloud Account contains an exchange of text communications between RIVERA and LOADHOLT on or about February 15, 2024, in which RIVERA told LOADHOLT, "I got 500 so far . . . have to go to western union to pick it up though . . ."

e.      According to Western Union records, on or about February 15, 2024, RIVERA received a transfer in the amount of approximately $549.69 from an individual having an address in the U.A.E. ("Payor-2").

f.      The Shakeri Cloud Account contains a photograph of a U.A.E. identity card for Payor-2.

g.      The Loadholt Cloud Account contains a photograph of a receipt from a gas station located a few minutes' drive from the University.

h.      According to license plate reader data, a black 2007 Honda Accord with South Carolina license plates, which is registered to LOADHOLT ("Loadholt's Accord"),

was at the entrance to Fairfield University on or about February 15, 2024, at approximately 7:00 p.m.

i.      The Rivera Cloud Account contains the images below, which have creation dates of on or about February 15, 2024. The image on the left appears to be a screenshot of a phone in camera mode focusing on a plaque at Fairfield University. In the bottom left corner of this screenshot, there is an image of RIVERA. The image to the right is a photograph of the interior of a building at Fairfield University.




j.      According to Western Union records, on or about February 16, 2024, RIVERA received a transfer in the amount of approximately $560.68 from Payor-1, the same individual who was the sender of the $3,298.15 transfer to CC-1 on or about December 29, 2023. *See supra* ¶ 27(c).

### March 2024: SHAKERI Pays RIVERA and LOADHOLT To Continue Targeting Victim-1

31.     In approximately March 2024, FARHAD SHAKERI, the defendant, paid CARLISLE RIVERA, a/k/a "Pop," the defendant, another approximately $2,600 so that RIVERA and JONATHAN LOADHOLT, the defendant, would continue targeting Victim-1, as described below.

#### *March 3, 2024*

a.      On or about March 3, 2024, RIVERA travelled from Staten Island to Brooklyn to conduct surveillance at the Brooklyn Residence.

b.      The Rivera Cloud Account contains stored text messages between RIVERA and LOADHOLT, dated on or about March 3, 2024. In those messages, RIVERA asked LOADHOLT, "Yo[.] Where u at[.] Gotta speak to you[.] Asap[.]"

c.      The Shakeri Cloud Account contains photographs of the Brooklyn Residence having a creation date on or about March 3, 2024. Accordingly, I believe that on or about March 3, 2024, RIVERA travelled to the Brooklyn Residence, surveilled and photographed the residence, and sent those photographs to SHAKERI.

### March 14, 2024

d.      According to records provided by Zelle, on or about March 14, 2024, RIVERA received a Western Union transfer of approximately $1,000 from an individual ("Payor-3") having an address in the United States.

e.      The Rivera Cloud Account contains a screenshot with a file date of March 14, 2024, which appears to be a video call between RIVERA and another participant. RIVERA's face is displayed in the bottom right corner of the screenshot, superimposed on an image of Victim-1. Accordingly, it appears that the other participant was displaying a photograph of Victim-1 for RIVERA.

f.      The next day, on or about March 15, 2024, RIVERA wrote to LOADHOLT, "We on go mode this Sunday." The following Sunday was March 17, 2024, on which, as set forth *infra*, RIVERA and LOADHOLT conducted surveillance of the Brooklyn Residence.

g.      On or about March 16, 2024, RIVERA received a second Zelle transfer of approximately $1,635 from Payor-3.

h.      The Rivera Cloud Account contains screenshots of text messages between RIVERA and the user of a phone number with a country code for Afghanistan (the "Afghanistan Number") between approximately March 13 and 16, 2024, in which RIVERA and the user of the Afghanistan Number discussed the $1,000 and $1,635 payments described above.

i.      The Shakeri Cloud Account has a contact entry for the Afghanistan Number under the name "Saraf," which is an Arabic and Persian word for a money exchange.

### March 17, 2024

j.      RIVERA and LOADHOLT returned to the Brooklyn Residence to conduct surveillance on or about March 17, 2024. The Rivera Cloud Account contains stored text messages between RIVERA and LOADHOLT dated on or about March 17, 2024. Between approximately 7:48 and 7:54 a.m.,[8] RIVERA messaged LOADHOLT: "Let's get it nigga[.] I know I'm late[.] But not really[.] Let's just go over there[.]" At approximately 8:20 a.m., RIVERA messaged LOADHOLT, "Helllloooooo[.]" LOADHOLT responded, "I'm bout to head out now[.]"

---

[8] All times set forth herein are EDT, unless indicated otherwise.

k.      According to license plate reader data, Loadholt's Accord crossed the Verrazzano Bridge from Staten Island to Brooklyn on or about March 17, 2024, at approximately 9:17 a.m. Loadholt's Accord crossed the Verrazzano Bridge from Brooklyn to Staten Island at approximately 12:12 p.m.

l.      According to cell site location data for LOADHOLT's 7034 Number, LOADHOLT was in the vicinity of the Brooklyn Residence at approximately 10:07 a.m. During the time when Loadholt's Accord was in Brooklyn, cell site location data for a cellular phone with a call number having a New York area code and ending in 1915 (the "1915 Number") shows that the phone remained in Staten Island. As described further below, RIVERA and LOADHOLT appear to have removed the license plate from Loadholt's Accord before reaching the Brooklyn Residence.

m.      On or about March 17, 2024, RIVERA made a $150 purchase at a cellphone store in Staten Island. According to records provided by a cellular service provider, a cellphone assigned a number with a New York area code ending in 1497 (the "1497 Number") was activated on that same day. The 1497 Number is saved in the contacts of the Shakeri Cloud Account under the name "Pop," which is RIVERA's nickname. The only contact saved in the cloud account associated with the 1497 Number is the Shakeri Maldives Number.

*March 23, 2024*

n.      RIVERA and LOADHOLT returned to the Brooklyn Residence to conduct surveillance on or about March 23, 2024. The Rivera Cloud Account contains stored text messages between RIVERA and LOADHOLT dated on or about March 20, 2024. At approximately 6:24 p.m., RIVERA messaged LOADHOLT, "Yo we gotta put that work in sat."

o.      March 23, 2024 was the Saturday following this message. According to license plate reader data, on or about March 23, 2024, Loadholt's Accord crossed the Verrazzano Bridge from Staten Island to Brooklyn at approximately 4:35 p.m. Loadholt's Accord crossed the Verrazzano Bridge from Brooklyn to Staten Island at approximately 8:43 p.m.

p.      During this time, according to cell site location data for RIVERA's 1915 Number, RIVERA's phone remained in Staten Island. Neither RIVERA's 1915 Number nor LOADHOLT's 7034 Number had any call or data activity during this time.

q.      According to cell site location data for RIVERA's 1497 Number, that cellphone was in the vicinity of the Brooklyn Residence on or about March 23, 2024.

*March 25, 2024*

r.      RIVERA and LOADHOLT returned to the Brooklyn Residence to conduct surveillance on or about March 25, 2024. The Rivera Cloud Account contains stored WhatsApp messages between RIVERA and LOADHOLT dated on or about March 25, 2024. At approximately 4:23 a.m., RIVERA messaged LOADHOLT, "Wya [where you at] nigga[.] Waiting on u[.]" LOADHOLT responded, "I'm coming now but leaving this here off." I understand LOADHOLT's message to mean that he was turning the cellphone assigned the 7034 Number off,

for the likely purpose of preventing the phone's location from being tracked while LOADHOLT was surveilling the Brooklyn Residence.

s.    Pole camera footage from the area of the Brooklyn Residence shows that on or about March 25, 2024, Loadholt's Accord arrived in the vicinity of the Brooklyn Residence at approximately 5:26 a.m.  No license plate is visible from currently available camera footage. At approximately 5:33 a.m., Loadholt's Accord parked on the street on the opposite side from the Brooklyn Residence, and down the block.

t.    At approximately 6:02 a.m., an individual exited the passenger side of Loadholt's Accord and walked toward the Brooklyn Residence, then turned around and walked away from the Brooklyn Residence and out of view of the pole camera. At approximately 6:33 a.m., an individual walked toward Loadholt's Accord from the north and got into the passenger side.

u.    At approximately 7:09 a.m., Loadholt's Accord drove in reverse and parked in the nearest open parking spot to the Brooklyn Residence. At approximately 7:28 a.m., the vehicle behind Loadholt's Accord drove away, and Loadholt's Accord then drove in reverse to occupy the vacated parking spot, which was even closer to the Brooklyn Residence.  At approximately 8:45 a.m., Loadholt's Accord then moved to a parking spot on the same side of the street as the Brooklyn Residence, near a fire hydrant.  At approximately 10:06 a.m., Loadholt's Accord drove away from the area.  During the approximately four-and-a-half hours Loadholt's Accord was parked near the Brooklyn Residence, the driver did not get out of the car.

v.    According to cell site location data for RIVERA's 1497 Number, that cellphone was in the vicinity of the Brooklyn Residence on or about March 25, 2024.

w.    According to call detail records for RIVERA's 1915 Number, on or about March 26, 2024, RIVERA had cellular phone contact with the Iran 5893 Number, the same number that was in contact with CC-1 in December 2023 and January 2024, *supra* ¶ 27.

*March 31, 2024*

x.    RIVERA and LOADHOLT returned to the Brooklyn Residence to conduct surveillance on or about March 31, 2024.  The Rivera Cloud Account contains stored text messages between RIVERA and LOADHOLT dated on or about March 30 and 31, 2024, discussing their plans to surveil the residence.  For example, on or about March 30, 2024, between approximately 11:11 p.m. and 11:17 p.m., RIVERA and LOADHOLT messaged about the early bird getting the worm, about setting an alarm, and about going to "sit on that from 5/6 to be safe[.]". RIVERA responded, "6[.]"

y.    At approximately 5:39 a.m. on or about March 31, LOADHOLT messaged RIVERA, "Ok this phone is going out now," which I understand to mean that LOADHOLT was turning his 7034 Number off.

z.    According to traffic video footage and license-plate reader data, on or about March 31, 2024, at approximately 6:18 a.m., Loadholt's Accord crossed the Verrazzano

Bridge from Staten Island to Brooklyn. At approximately 12:32 p.m., Loadholt's Accord crossed the Verrazzano Bridge from Brooklyn to Staten Island.

           aa.     On or about March 31, 2024, Loadholt's Accord arrived near the Brooklyn Residence at approximately 6:36 a.m. and parked on the street. The Brooklyn Residence was visible from the location where Loadholt's Accord was parked. Loadholt's Accord was not displaying any license plates at the time, and the occupants did not get out of Loadholt's Accord for nearly four hours.

           bb.     At approximately 10:29 a.m. on March 31, 2024, RIVERA and LOADHOLT exited Loadholt's Accord and walked approximately two blocks to a bagel store. As shown on security camera footage from the bagel store, and according to an interview of an employee of the bagel store, RIVERA gave the name for his order as "Pop" and paid for his order in cash. LOADHOLT, who wore a surgical mask the entire time he was in the bagel store, gave the name for his order as "Peter," and took out a card to pay. RIVERA stopped LOADHOLT from paying with a credit card and RIVERA paid for the order with cash instead. I believe that RIVERA paid in cash so that the purchases would not leave a record of financial transactions involving credit card or bank card information that could identify RIVERA and LOADHOLT.

           cc.     RIVERA and LOADHOLT then returned to Loadholt's Accord, which was still parked down the street from the Brooklyn Residence, and entered the car. Approximately 40 minutes later, at approximately 12:09 p.m., Loadholt's Accord drove away from the Brooklyn Residence.

           dd.     From my training and experience, and my discussions with other law enforcement officers, I have learned that Loadholt's Accord likely would have driven past other license-plate readers between the Verrazzano Bridge and the Brooklyn Residence, but the license plate assigned to Loadholt's Accord did not register on any other license plate reader during the times on March 3, 17, 25, and 31, 2024, when Loadholt's Accord was in Brooklyn. Accordingly, it appears that the occupants of Loadholt's Accord removed its license plate after crossing the Verrazzano Bridge and prior to arriving at the Brooklyn Residence; and that they replaced the license plate after departing the Brooklyn Residence and before crossing the Verrazzano Bridge back to Staten Island. I believe the purpose of removing the license plate was to avoid having the license plate detected during the time that RIVERA and LOADHOLT were conducting surveillance targeting Victim-1.

           ee.     According to cell site location data for RIVERA's 1497 Number, that cellphone was in the vicinity of the Brooklyn Residence on or about March 31, 2024.

           ff.     On or about April 1, 2024,[9] SHAKERI and RIVERA exchanged voice notes discussing RIVERA and LOADHOLT's efforts to locate and murder Victim-1.

---

[9] It appears that RIVERA sent the voice notes on or about March 31, 2024, while RIVERA and LOADHOLT were surveilling the Brooklyn Residence. *Supra* ¶ 30(x)-(ee). In one voice note, RIVERA refers to it being Easter Sunday, which was March 31, 2024. RIVERA also refers to having gone to get something to eat, consistent with RIVERA and LOADHOLT's visit to the bagel

          i.       In one voice note, RIVERA stated, among other things, "this bitch is hard to catch, bro. And because she hard to catch, there ain't gonna be no simple pull up, unless there the luck of the draw. Unless there's the luck of the draw."

          ii.      In a voice note from SHAKERI to RIVERA, SHAKERI told RIVERA that Victim-1 spent most of the time in a study on the third floor and a recording studio on the second floor. SHAKERI went on to state, among other things, that "you just gotta have patience and don't, kicking, kick in the door is not an option because that's a fail, that's a fail maneuver. You gotta wait and have patience to catch her either going in the house or coming out, or following her out somewhere and taking care of it. Don't think about going in. In is a suicide move."

          iii.     In a subsequent voice note, RIVERA stated, among other things, that "we was here at night time, like 5:30 this morning, there was no fuckin' lights on. . . . I already know kickin' in doors only gonna to bring more attention. We already know that, that part. That neighborhood is too quiet for that type of shit. Unless she's on the first floor, and you kick that shit in and then, then, you know, and let's assume you kick it in on the first try."

          iv.     In a subsequent voice note, RIVERA stated, "If we can catch her walking through the door, that's something different. Getting' out the car, that's easy. Kickin' the fuckin' door in? That ain't gonna work, bro. That ain't gonna work. Kickin' the door in's not gonna work."

          v.      In a subsequent voice note, apparently responding to a message from SHAKERI, RIVERA stated:

> What I'm sayin' to you in a nutshell, bro. Is in order for this to get done? And I don't give a fuck who is [U/I]. You say, "fuck you, nigga, I want somebody else." Ok, your secret safe with me 'cause I ain't no snitch nigga, and I sure ain't no bitch nigga. So I can handle that, right. By the same token, you not gonna find too many motherfuckers who willing to take the job with receiving next to nothin' to start the job off with. You sent me thirty-one fifty, right? That pays for some tools and fuels, right? Tools and fuels that's being, the slammer, mostly, the slammer. Um, toll bridge fee, going back and forth. Putting gas in the car. Rentin' the car. Look, the car ain't mine bromie, that shit is bein' rented. It's funded by the thirty-one fifty. Shit ain't, know what I mean, niggas ain't just lettin' you hold their car to do a drive by for nothin', know what I mean, so. . . .
>
> But homie, how long you think that's gonna last? How long can you expect two workin' niggas, or one workin' nigga, really me, but my man too, he a workin' nigga too. He not like, he's gonna sit out here

store. *Supra* ¶ 30(bb). The April 1, 2024, date associated with the voice note files appears to reflect the time difference between New York and Tehran, which is several hours ahead of the Eastern time zone.

all night, all day, rain, cold, sleet, on a promise. Let's be for real, we out here on a promise, from a nigga I know. Not even a nigga he knows, a nigga I know. But the less he knows, the better off you are. The less you know, the better off he is. Only thing y'all knew each other is through me.

So, how far, realistically speaking, how far can a, will a nigga move, or how much will a nigga move on a promise? Niggas be like nah, I don't give a fuck how I know you, nah I ain't riskin' that. And he ask me, he said yo, how you feel about, how I feel about you. I say "yo, he's always been good people with me. He's always had good character to me. . . . If it was anybody else I'd say get the fuck out my face. Because it's him, and I know it's him, I'm tempted to believe him. I'm willing to give it a try for him."

From my training and experience and my participation in this investigation, I understand RIVERA's reference to a "tool" called a "slammer" means a firearm. In this voice note, it appears that RIVERA informed SHAKERI, among other things, that RIVERA and LOADHOLT had used the $3,150 received by RIVERA from SHAKERI to purchase a firearm, to pay travel costs, and to pay for the use of the car intended for use in a "drive by," or a drive-by shooting. RIVERA further informed SHAKERI that RIVERA was willing to carry out the murder without a larger up-front payment because of RIVERA's trust in SHAKERI, and that RIVERA had persuaded LOADHOLT to do the same based on RIVERA's vouching for SHAKERI.

<u>April 2024: SHAKERI and RIVERA Discuss a Further Payment<br>of $100,000 to "Finish the Work"</u>

gg.    In April 2024, SHAKERI and RIVERA discussed an additional payment of approximately $100,000 for RIVERA to "finish the work." The Rivera Cloud Account contains text messages on or about April 19, 2024, between SHAKERI and RIVERA:

i.    RIVERA messaged SHAKERI, "Are we still on? Is that a green light?" SHAKERI responded that he had attempted to call RIVERA but RIVERA had not picked up the call.

ii.    SHAKERI then messaged RIVERA that "I haven't talked to my man, I'm still travelling[.] The 100k is still there[.]" RIVERA responded, "I don't even have that dollar bill I sent u the pick [sic] of[.]"

iii.    From my training and experience and my participation in this investigation, I know that individuals involved in money laundering and other criminal activities often use serial numbers on currency to authenticate the parties to a cash delivery: one of the parties will provide a photograph of a bill so that the person delivering the money and the person receiving the money can compare the serial number and confirm that each is the correct counterparty.

iv.    SHAKERI asked RIVERA to send "another bill" on "the other math," which I understand to mean send a picture of another dollar bill on another phone

number. As described above, RIVERA also uses the 1497 Number. *Supra* ¶ 31(m), (q), (v), (ee). After SHAKERI and RIVERA exchanged messages about neither of them having cash on them, RIVERA sent a photograph of a book with an ISBN number and asked SHAKERI to use that number. In a subsequent text message, SHAKERI confirmed that he was using the number "ending in 98," which are the last two numbers of the ISBN number.

     v.   SHAKERI then responded, "Finish the work, and pick up[.]" RIVERA answered, "Nigga I wish it was that easy but I ain't no quitter[.]"

     vi.   From my participation in this investigation and the context of the communications, I understand this exchange to relate to a payment of $100,000 in cash relating to the targeting of Victim-1 if RIVERA completed the task, *i.e.*, to murder Victim-1, that had been assigned to him by SHAKERI. Among other reasons, SHAKERI described being tasked by the IRGC to provide individuals to locate and kill Victim-1. The proposed $100,000 payment is much larger than the payments SHAKERI made to CC-1 for surveillance activity in December 2023 and to RIVERA for surveillance activity in February 2024. RIVERA's heightened use of secretive communication methods by obtaining a second cellphone on or about March 17, 2024; RIVERA and LOADHOLT's repeated and frequent travel to the Brooklyn Residence in March 2024; and, as described in further detail below, SHAKERI's failure to disclose information about RIVERA and LOADHOLT to the FBI during telephonic interviews, despite that information being directly and obviously responsive to several questions that were posed to him, further show that "finishing the work" meant murdering Victim-1.

     hh.  The Shakeri Cloud Account contains a screenshot of what appears to be an approximately 32-second-long video depicting the Brooklyn Residence, dated on or about April 28, 2024, at approximately 6:11 p.m., which was sent by an individual with the contact name "CR," which I believe refers to RIVERA. As set forth *infra* ¶ 32(a), this screenshot was saved to the Shakeri Cloud Account again on or about August 4, 2024.

### July and August 2024: SHAKERI, RIVERA, and LOADHOLT Discuss the $100,000 Payment to "Take Care of It Already"

     ii.   On or about July 16, 2024, SHAKERI, using the Shakeri Maldives Number, and RIVERA, using the 1915 Number, again discussed the payment of $100,000 for RIVERA to "take care of it already." A screenshot of these text messages is saved in the Shakeri Cloud Account, and contains the following:

     i.   RIVERA wrote, "What are we doing nigga? // Waiting on u[.]" SHAKERI responded, "I know // I'm pushing // I just renewed the 100K," which, based on my involvement in this investigation, I believe refences the $100,000 payment SHAKERI previously offered RIVERA to "[f]inish the work," meaning to murder Victim-1. *See supra* 31(gg)(v).

     ii.   SHAKERI then wrote that he had "Been traveling" and that his "schedule is hectic," before sending an apparently close-range image of Victim-1 in workout attire lifting weights in a gym. SHAKERI continued, writing to RIVERA, "I wish you can take care of it already // I have everything covered // By the way send me a bill and don't spend it

nigga." SHAKERI then wrote, "Just do it son, I'll handle the rest. I won't let you down // That's my word I got you covered till the weeks [*sic*] fall off // Do me the solid[.]" From my training and experience, and my participation in this investigation, I understand SHAKERI's instruction to RIVERA to "take care of it already" to refer to murdering Victim-1. I further understand SHAKERI's instruction to "send me a bill and don't spend it" to mean that RIVERA should send SHAKERI a photograph of currency in order to use the serial number in connection with a cash transfer, and not to spend it, as RIVERA had done previously. *See supra* ¶ 32(gg)(ii)-(iv).

     iii.  Following these communications between SHAKERI and RIVERA, on or about July 16, 2024, at approximately 2:59 a.m., RIVERA sent LOADHOLT two screenshots, containing the text message conversation between RIVERA and SHAKERI described above. These screenshots were saved in the Loadholt Cloud Account. RIVERA and LOADHOLT then exchanged the following electronic communications:

     (a)  At approximately 3:00 a.m., immediately after sending the screenshots, RIVERA asked LOADHOLT, "Got it?"

     (b)  At approximately 3:04 a.m., after seeking additional clarification, LOADHOLT asked, "So no 10 up front I'm guessing??" to which RIVERA responded, "No."

     (c)  LOADHOLT responded, "Yo wtf [what the fuck]." RIVERA responded, "I just that today," to which LOADHOLT replied, "I'm screaming my head off ryt now[.]" RIVERA wrote, "Me too." LOADHOLT wrote, "I'm so frustrated son I'm like ready to jump out the window."

     (d)  Based on my training, experience, and involvement in this investigation, I believe that, in these messages, RIVERA and LOADHOLT were discussing the absence of a $10,000 payment for killing Vicitm-1 "up front," meaning before they committed the murder, and as an advance for the full $100,000 payment SHAKERI had promised them for successfully killing Victim-1.

     iv.  The image below, depicting a firearm with an extended magazine, *i.e.*, a magazine that can hold more bullets, and what appears to be two additional magazines, was saved to the Loadholt Cloud Account with a file date of on or about July 23, 2024:



32.     In or about early August 2024, the Shakeri Cloud Account saved images relating to Victim-1:

a.     On or about August 4, 2024, the screenshot of the apparent approximately 32-second-long video of the Brooklyn Residence, initially sent from CARLISLE RIVERA, a/k/a "Pop," the defendant, to FARHAD SHAKERI, the defendant, on or about April 28, 2024, was re-saved to the Shakeri Cloud Account.

b.     On or about August 6, 2024, a screenshot depicting one of Victim-1's social media accounts, including an image of Victim-1 in the profile, was saved to the Shakeri Cloud Account.

**SHAKERI's Interviews with the FBI**

33.     From my discussions with other FBI agents and my review of written reports, I have learned that on or about September 30, October 8, October 17, October 28, and November 7, 2024, FARHAD SHAKERI, the defendant, participated in voluntary telephonic interviews with FBI agents.[10]  SHAKERI represented that, at the time of the interviews, he was

---

[10] SHAKERI's stated reason for participating in the interviews was to attempt to obtain a sentence reduction for another individual ("Individual-1"), who is serving a sentence in U.S. prison, by providing assistance to law enforcement on this individual's behalf.

located in Tehran, Iran. During these interviews, SHAKERI stated, in substance and in part, the following:

a.    Through SHAKERI's work in the Iranian oil and fuel business, he met an individual, a co-conspirator not named as a defendant herein, who SHAKERI described as a senior member of the "*sepah*" or the Revolutionary Guard, referring to the IRGC ("IRGC Official-1"). According to SHAKERI, IRGC Official-1 was referred to by others as "Majid Soleimani," but SHAKERI did not know if that was his real name or if IRGC Official-1 had a familial connection to Qasem Soleimani. IRGC Official-1, after learning that SHAKERI had lived in New York, asked SHAKERI about investigating Victim-1.

b.    SHAKERI had met with IRGC Official-1 on more than approximately one dozen occasions. SHAKERI explained that these meetings generally were arranged by an intermediary, a co-conspirator not named as a defendant herein ("CC-3"), who indicated when and where SHAKERI should meet IRGC Official-1. The meetings took place in different restaurants in Iran, and generally took place in Tehran. Prior to each meeting, IRGC Official-1 required SHAKERI to leave his phones outside the room in which they met. However, SHAKERI explained that IRGC Official-1 sometimes directed SHAKERI to use his (SHAKERI's) phone to take pictures of images displayed on IRGC Official-1's phone, so that there would be no record of communications between them.

<u>Victim-1</u>

c.    According to SHAKERI, IRGC Official-1 initially said that Victim-1 had stolen approximately $250,000 and that the IRGC had tracked Victim-1 to Brooklyn, New York. IRGC Official-1 showed SHAKERI a photograph of Victim-1 and asked SHAKERI if he (SHAKERI) could check out an address the IRGC had identified as Victim-1's residence, in order to gather more information about Victim-1 in exchange for payment. SHAKERI believed the IRGC exercised some form of monitoring of Victim-1 because IRGC Official-1 appeared to have information about Victim-1's activities and travel.

d.    During the interview on September 30, 2024, SHAKERI stated that IRGC Official-1 told SHAKERI that if he (SHAKERI) was able to locate Victim-1, the IRGC would pay approximately $1.5 million to have Victim-1 killed. IRGC Official-1 said that the IRGC wanted Victim-1 killed immediately, "nighttime, daytime, anywhere."

e.    According to SHAKERI, he agreed to provide surveillance of Victim-1 but did not agree to provide an assassin. SHAKERI researched Victim-1 on the Internet and learned Victim-1's identity and additional information about Victim-1's possible residence.

f.    In response to questions about whether he did, in fact, enlist others to surveil Victim-1, SHAKERI identified CC-1. According to SHAKERI, SHAKERI paid CC-1 approximately $3,000 to take a picture of Victim-1's residence.

g.    SHAKERI repeatedly denied having asked anyone else to perform surveillance of Victim-1 and stated that he did not have anyone else in the New York City area who could provide that type of surveillance. SHAKERI also claimed that he had deleted information about Victim-1's address from his phone. As described above, these claims were false

and SHAKERI in fact had paid CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, to surveil and attempt to surveil Victim-1 and had promised them a larger payment for Vicim-1's murder. *Infra* ¶¶ 31(ff).

h.    SHAKERI believed that, in addition to seeking Victim-1's murder, IRGC Official-1 was testing SHAKERI's ability to provide individuals for surveillance and assassination so that the IRGC could use SHAKERI to target other victims as well.

i.    SHAKERI stated that IRGC Official-1 subsequently came to believe that Victim-1 had moved out of the New York City area, and SHAKERI told IRGC Official-1 that he (SHAKERI) did not have anyone in Victim-1's new location to target Victim-1. Nevertheless, during the interview on October 8, 2024, SHAKERI stated that he had met with IRGC Official-1 in person on or about October 7, 2024, and, during that meeting, IRGC Official-1 reiterated the IRGC's interest in killing Victim-1, and again offered SHAKERI approximately $1.5 million to carry out the assassination. SHAKERI further explained that, in order for SHAKERI to be paid, IRGC Official-1 would require SHAKERI to provide video evidence that Victim-1 had been killed and that SHAKERI's team had committed the murder. Accordingly, it appears that IRGC Official-1 contemplated the possibility that other teams had been tasked with carrying out Victim-1's murder, and sought to ensure that money was paid only to the team that was able to successfully carry out the assassination.

j.    During an interview on or about October 28, 2024, SHAKERI admitted that he had someone in New York who was willing to kill Victim-1. SHAKERI refused to identify that person, stating, "that's not something I'm gonna provide until I get some kind of [U/I]. If these people gimme a green light . . . I'm gonna come pretty close so you guys can be convinced that [Individual-1] needs to get released."

k.    During an interview on or about November 7, 2024, SHAKERI, after being confronted that he had not been fully truthful in prior communications with law enforcement, acknowledged that he had been withholding this information, identified CARLISLE RIVERA, a/k/a "Pop," the defendant as the individual in New York who was willing to kill Victim-1 and whom he had previously referenced. During the interview, SHAKERI also stated that RIVERA had an associate who was working with RIVERA, but SHAKERI did not provide that individual's name.

### Victim-2 and Victim-3

l.    According to SHAKERI, IRGC Official-1 also tasked SHAKERI with surveilling two Jewish American citizens residing in New York City ("Victim-2" and "Victim-3"), whom SHAKERI described as Jewish businesspeople residing in New York City. SHAKERI explained that the IRGC provided him with pictures of Victim-2 and Victim-3, which, according to SHAKERI, appeared to come from social media and which indicated Victim-2 and Victim-3's support for Israel.

m.    SHAKERI stated that IRGC Official-1 offered SHAKERI $500,000 for the murder of each of Victim-2 and Victim-3. According to SHAKERI, he had not provided IRGC Official-1 or the IRGC with information about Victim-2 or Victim-3.

24

Victim-4

n.     Also according to SHAKERI, in approximately mid-to-late September 2024, IRGC Official-1 asked SHAKERI to put aside his other efforts on behalf of the IRGC and focus on surveilling, and, ultimately, assassinating, former President of the United States, Donald J. Trump ("Victim-4" herein).  SHAKERI indicated to IRGC Official-1 that this would cost a "huge" amount of money.  In response, IRGC Official-1 said that "we have already spent a lot of money . . . [s]o the money's not an issue," which SHAKERI understood to mean that the IRGC previously had spent a significant sum of money on efforts to murder Victim-4 and was willing to continue spending a lot of money in its attempt to procure Victim-4's assassination.

o.     According to SHAKERI, during his meeting with IRGC Official-1 on or about October 7, 2024, IRGC Official-1 directed SHAKERI to provide a plan within seven days to kill Victim-4.  If SHAKERI was unable to put forth a plan within that timeframe, IRGC Official-1 continued, the IRGC would pause its plan to kill Victim-4 until after the U.S. Presidential elections, because IRGC Official-1 assessed that Victim-4 would lose the election and, afterward, it would be easier to assassinate Victim-4.  During the interview, SHAKERI claimed to the FBI that he did not intend to propose a plan to murder Victim-4 within the timeframe set by IRGC Official-1.

Israeli Tourists in Sri Lanka

p.     According to SHAKERI, IRGC Official-1 also asked SHAKERI to target Israeli tourists in Sri Lanka and to plan a mass shooting event in approximately October 2024.

q.     On or about October 23, 2024, the governments of the United States and Israel publicly warned travelers about threats of an attack targeting tourist locations in the Arugam Bay area, and, on or about the following day, Sri Lankan authorities reported having arrested three individuals in connection with the threat.  One of the individuals arrested was identified as CC-2.

r.     On or about October 28, 2024—after the public travel warnings issued by the governments of the United States and Israel and after CC-2's arrest by Sri Lankan authorities—SHAKERI advised the FBI that he had previously tasked CC-2 with surveilling the Israeli consulate in Sri Lanka.  SHAKERI stated that he and CC-2 had served time in prison together.  SHAKERI informed the FBI that he had provided this surveillance to IRGC Official-1.

s.     According to SHAKERI, after being provided surveillance on the Israeli consulate, IRGC Official-1 asked SHAKERI to identify another target, and SHAKERI then instructed CC-2 to surveil a tourist location in Arugam Bay frequented by Israeli tourists.  IRGC Official-1 instructed SHAKERI to orchestrate a mass shooting at the Arugam Bay location.  And, according to SHAKERI, they planned that CC-2 would supply AK-47s and other weapons for the attack.

34.     Based on my involvement in this investigation, including my conversations with other FBI agents, and review of reports, electronic data, and the recordings and transcripts of the FBI's interviews of FARHAD SHAKERI, the defendant, on or about September 30, October

8, October 17, October 28, and November 7, 2024, certain of SHAKERI's statements to the FBI during his interviews appear to have been true and others appear to have been false. For example, and as detailed *infra*, the investigation has revealed that SHAKERI has, in fact, directed his criminal associates, including CARLISLE RIVERA, a/k/a "Pop" and JONATHAN LOADHOLT, the defendants, to surveil and murder Victim-1, which SHAKERI denied until his most recent interviews with law enforcement, on or about November 7, 2024. In electronic communications, SHAKERI discussed with RIVERA a payment of at least approximately $100,000 for RIVERA to "finish the work," meaning to murder Victim-1. SHAKERI's statements that he had enlisted only CC-1 to conduct surveillance of Victim-1 were false, which when confronted in his most recent interviews by law enforcement, he ultimately admitted to be false; though, even then, SHAKERI was not forthcoming about the full scope of his conduct. However, and as discussed, in part, above, certain of SHAKERI's statements appear to be truthful, including, among others, his statements regarding the IRGC's targeting of Victim-1 and Victim-4 and the IRGC's willingness to pay large sums of money to accomplish its deadly goals.

WHEREFORE, I respectfully request that warrants be issued for the arrests of FARHAD SHAKERI, CARLISLE RIVERA, a/k/a "Pop," and JONATHAN LOADHOLT, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

MATHEW CHRUSZ
Special Agent
Federal Bureau of Investigation

Sworn to me this 8th day of November, 2024.

THE HONORABLE JENNIFER E. WILLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

26